UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| J. C. THROUGH HER PARENTS, | : | |
| MR. AND MRS. C. | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:08-cv-1591 (VLB) |
| NEW FAIRFIELD BOARD OF | : | |
| EDUCATION | : | |
|     DEFENDANT | : | March 31, 2011 |

<u>MEMORANDUM OF DECISION GRANTING THE DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [Doc. #32], AND MOTION FOR SUMMARY JUDGMENT [DOC. #33], AND DENYING THE PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT [DOC. #35]</u>

The Plaintiffs, J.C. through and with her parents Mr. C. and Mrs. C (hereinafter, "Parents"), initiated this proceeding against the New Fairfield Board of Education (hereinafter "Board") to appeal a September 4, 2008 final decision, issued by a Due Process Hearing Officer ("Hearing Officer") that denied recognition of her myoelectric prosthetic arm as assistive technology ("AT") necessary to secure a free appropriate public education ("FAPE") within the meaning of the Individuals with Disabilities Education Act (IDEA) 20 U.S.C. § 1400 *et seq*. The Plaintiffs seek reversal of the Hearing Officer's Final Decision and Order pursuant to five causes of action: 1) that the Final Decision and Order of the Due Process Hearing Officer violated J.C.'s right to receive FAPE as guaranteed by the IDEA and its regulations; 2) that the Defendant acted in bad faith in that it discriminated against J.C., on the basis of physical disability, while implementing a federally funded program of special education and attendance in

violation of § 504 of the Rehabilitation Act; 3) that the Hearing Officer's Final decision violated J.C.'s right to receive appropriate special education services under Connecticut General Statute § 10-76 *et seq.* and its regulations; 4) that the Hearing Officer's Final Decision violated J.C.'s rights as provided by Connecticut General Statutes § 4-183, because it was "not based on substantial evidence on the record of the administrative procedures, and [was] arbitrary, capricious and illegal," and 5) the Plaintiffs are entitled to redress for fraud and misrepresentation because the Board's refusal to pay $11,000.00 for J.C.'s myoelectric arm during the 2007-2008 school year violated the terms of an April 4, 2007 PPT and a June 6, 2007 Individualized Education Program ("IEP"). [Doc. #1].

Now Before the Court is the Board's Motion for Judgment on the Administrative Record as to the Plaintiffs' Complaint in its entirety. [Doc. #32]. The Board contends that the Hearing Officer's decision should be affirmed because the Board complied with the procedural requirements of the IDEA and because J.C.'s IEP was reasonably calculated to provide an educational benefit. [*Id.*]. The Board also asserts that Judgment should enter in it's a favor as to Counts Two and Five as the allegations fail to support a violation of § 504 of the Rehabilitation Act and also fail to support a claim for fraud or misrepresentation. [*Id.*]. The Board also contends that J.C.'s common law claims are barred by governmental immunity. [*Id.*]. The Board simultaneously moves, in the alternative, for summary judgment against the Plaintiffs as to Counts Two and Five in the event the Court finds that these counts are not limited to the

administrative record. [Doc. #33]. In turn, the Plaintiffs cross-move for summary

judgment as to all counts. [Doc. #35].


<u>Background And Review of the Administrative Record</u>

The following facts are drawn from the portions of the administrative

record that the parties have submitted for the Court's consideration, and

undisputed facts presented in the parties' Local Rule 56(a)(1) Statements[1].

Accordingly, facts are undisputed unless otherwise noted. "J.C." is a six-year-

old child residing in New Fairfield, Connecticut and was born with an amputation

below her left elbow. Due to her congenital condition, J.C. has no left forearm,

wrist or hand. J.C. was deemed eligible for Connecticut's Birth-to-Three services

on October 19, 2004, when she was two months old. Birth-to-Three services is an

early intervention program that serves children up until their third birthday.

When J.C. reached six months of age, she was fitted for, and began using, a

passive prosthetic left arm that served, in part, as preparation for a functional

prosthetic in the future. A passive prosthetic arm fits to the end of an individual's

missing limb, and extends to approximately the same length as a natural limb,

and assists an individual in reaching and picking up items, but is static and does

not move from its manufactured form. When J.C. reached fourteen months of

---

[1]The record before the Court includes the Hearing Officer's Final Decision, a prior administrative
decision regarding special education services provided at the Birth-to-Three level, transcript
excerpts of administrative hearing testimony, and exhibits introduced during the hearing by the
Plaintiffs (bearing the labels "P"), and the Defendant Board (bearing the label "B"). The Court
notes that the parties have not submitted the entire administrative record for its review and that
the Plaintiffs make references to exhibits in the administrative record which are not included in the

age, she commenced use of a myoelectric prosthetic arm ("myoelectric arm"), that featured moving fingers that opened and closed in response to J.C.'s muscle movement. J.C.'s passive prosthetic and myoelectric arm were fabricated and fitted by non-physicians, however the Parents obtained a prescription for the prosthetic as their health insurance company required a medical prescription in order to receive reimbursement for costs associated with the prosthetic device. The myoelectric arm is classified as durable medical equipment for medical purposes.

In 2005, Connecticut's Birth-to-Three system denied the Plaintiffs' request for payment of costs associated with the myoelectric arm. J.C.'s parents therefore requested a hearing, and on October 13, 2005 a hearing officer for Birth-to-Three services concluded that J.C.'s Individualized Family Service Plan ("IFSP") was flawed due to its failure to recognize her myoelectric arm as an Assistive Technology Device ("AT") for Birth-to-Three. The hearing officer, for that proceeding, instructed the IFSP team to convene and revise the IFSP in conformity with the officer's finding, and instructed Birth-to-Three services to also pay for the myoelectric arm. J.C. received Birth-to-Three services relating to her amputated left arm and its direct and indirect effects including: left sided atrophy, body asymmetry, bilateral strength and mobility. J.C. participated in the system and her myoelectric arm was recognized as an AT during her time in the program through age three.

_____

record of this case.

**4**

During January 2007, when J.C. was two years and five months of age, Family Junction, J.C.'s Birth-to-Three service provider, referred her and her parents to New Fairfield Public Schools ("District") to discuss the special education services that would commence on her third birthday. On April 4, 2007, the District convened a Planning and Placement Team ("PPT") meeting between the Parents and the District to discuss J.C.'s transition to the public school system and referral to special education by Birth-to-Three services. In attendance were the Parents, school administrator Mary Jo Terranova, special education teacher Marie Moore, occupational therapist Barbara Cage, physical therapist Diane Twedt, Birth-to-Three occupational therapist and service coordinator Marjorie Kacir, and Daniel A. Thomas who served as an advocate and advisor to the family during the meeting and who was subsequently identified as the Parents' attorney.

The April 2007 PPT recommended a physical therapy evaluation, an occupational therapy evaluation and an AT consultation. J.C.'s parents signed a consent form for these evaluations and the consultation. The completed report form of the April 2007 PPT meeting reflects the following selections as the purpose for the meeting: "Review Referral," "Plan Eval/Reeval" and "Other (specify) Transition from B-3." The option of "Determine Eligibility" was not selected [Exh. B-5, Doc. #33, Attach 5]. The completed form also identifies "Orthopedic Impairment" as J.C.'s primary disability, identifies a second PPT meeting date for June 20, 2007, and includes a check marked yes to the question:

"Eligible as a student in need of Special Education (The Child is evaluated as having a disability, and needs special education and related services)" [*Id.*].  The meeting report lists occupational and physical therapy evaluations and an AT consultation as recommended next steps and summarizes the meeting as follows: "Birth to 3 provider described limitations & difficulties that are a direct result of her prosthetic hand."  [*Id.*].  Lastly, the notice and consent form that the Parents signed indicated that J.C. was being "referred for an evaluation to determine eligibility for special education services."  [*Id.*].

Following the April 4, 2007 PPT meeting, Mr. C. submitted a letter to Ms. Terranova  on April 16, 2007 requesting corrections to the PPT document to properly list his daughter's age and ethnicity.  He also asked that the meeting summary clearly indicate that while J.C.'s prosthetic arm served as a helpful AT device, she continued to require assistance with activities of daily living.  Terranova thereafter made the requested changes.  As noted by the Hearing Officer "[t]he [demographic] corrections on page 1 were, but the additional comments in the PPT meeting summary [regarding the prosthetic arm] were not, placed in the Student's file.  The Parents had received and kept a copy of both pages of the revised PPT document, which they offered into evidence at the hearing.  Ms. Terranova verified the accuracy of [the exhibit]." [Final Decision at 8 ¶ 32, Doc. #1 (internal citations omitted)].

On April 25, 2008, Ms. Kacir, who served as  an occupational therapist, with an entity known as Family Junction, conducted an AT consultation by telephone

6

with Amy Norton, a staff member at the New England Assistive Technology Program ("NEAT').  Ms. Kacir's consultation summary and report reflects the following:

> [J.C.] has received services from the Connecticut Birth to Three systems since she was two months old . . . As [J.C.] is approaching her third birthday, she was referred to the local public school to determine eligibility for special education and related services.  At a transition meeting held at the school on April 4, 2007, school personnel agreed that [she] would be eligible for preschool special education based on orthopedic handicap.  Supervisor of Early Education, Mary Jo Terranova, reported that she had spoken to a staff member at the New England Assistive Technology Program, who had recommended that B-3 get a consultation (not an assessment) from NEAT.  [J.C.'s] father signed a form giving consent to conduct evaluations, including an AT consult to assess adaptive skills to be completed by a consultant to be determined by B-3 . . . Tom Coakley advised Family Junction that B-3 does not pay for any adaptive equipment or assistive technology that is to be used in the school and should not incur expenses for a consultation or evaluation. . . Amy Norton at NEAT was contacted by telephone . . . Ms. Norton said that the need for equipment would be determined by the barriers to full function in the school setting. . . .

[Exh. B-6, Doc. #33, Attach. 6].  On May 23, 2007, Ms. Kacir completed an occupational therapy evaluation consisting of the Peabody Developmental Motor Scales-Second Edition, Fine Motor Scales, a clinical observation, and a review of the Parent's report of J.C.'s skills.  On June 1, 2007, Diane Twedt completed a physical therapy evaluation which consisted of the Peabody Developmental Motor Scales-2, gross motor subtests, and clinical observations.

On June 6, 2007, the District convened a second PPT meeting to review J.C.'s evaluation results.  The May 9, 2007 notice for the June 2007 PPT identifies the following as purposes for the meeting: "review evaluation results and

determine eligibility for special education," "develop, review or revise the [Individualized Education Program ("IEP") and "other: (specify) Determine Placement." [Exh. B-9, Doc. #33, Attach. 9]. The June 2007 PPT noted that J.C. was eligible for special education services.  The Plaintiffs indicate that this PPT confirmed an eligibility determination that was made during the April PPT meeting, while the Board contends that the June PPT first found her eligible for the services.  The June 2007 PPT determined that J.C.'s performance was age appropriate in all cognitive, academic and communication areas, and that her social-emotional performance was also age-appropriate, but the Parents expressed concern regarding potential self-esteem issues arising from her physical condition.  The PPT also noted, in connection with daily life activities, "some delays because of lack of independence due to congenital amputation" and concern regarding bilateral tasks noting J.C. was "at risk of asymmetry because of weight of myoelectric prosthesis" and difficulty with "object manipulation."  The report also noted that "many preschool activities are bilateral in nature" and that J.C. "may experience difficulty with typical pre-k motor activities as a result of her amputation."  [*Id.*].

Using her present performance levels and preschool guidelines, the June 2007 PPT developed four goals: 1) "to improve strength and active assistive use of left arm/myoelectric prosthesis," 2) to "perform age appropriate bilateral tasks in the classroom with adaptions," 3) "to perform age appropriate self help skills in the classroom with adaptations," and 4) to "demonstrate clear understanding

8

of her physical disability and . . . begin to self-advocate at an age appropriate level." [*Id.*].

In identifying special education related services, the June 2007 IEP allocated 10.5 hours of special education services to address goals two, there, and four, and 1.5 hours to address the physical and occupational therapy objectives identified in goal one.  The IEP also selected the "Not Required" box in connection with a prompt regarding assistive technology, but also included a note next to that selection that reads "Already fitted & using myoelectric arm"). [Exh. B-9, Doc. #33, Attach. 9]. The IEP also identified J.C.'s planned placement in the District's preschool at a location known as "Consolidated School."  The Parents did not object to the June 2007 IEP, which clearly indicated that the myoelectric arm was "Not Required," and on June 6, 2007 provided express consent to proposed initial placement in special education.  [Exh. B-10, Doc. # 33, Attach. 10].  There is no indication in the record that J.C.'s parents sought clarification of the conclusion that the myoelectric arm was "Not Required."

J.C. entered New Fairfield's preschool program on September 4, 2007, when she was three years old, and wore her prosthetic arm to school most days, but there were occasions when J.C. attended school without the arm because it was under repair. The Board contends that District staff worked with J.C. on occasions when she was not wearing the myoelectric arm, and that she was able to function without the myoelectric arm.  Notably, Ms. Twedt testified as follows:

Q: . . . Have you ever worked with Jennifer in physical therapy sessions when she was not wearing her prosthetic arm?
A: Yes, at the time when she was perspiring and we had to take it off.
Q: Were you able to give her a physical therapy session that day and work on her goals and objectives?
A: Yes.

[Tr. 5/7/08 p. 44, Doc. # 33, Attach. 35]. Similarly, Ms. Cage tesitifed:

A: She most often has the Myoelectric arm on, she comes in with it on. There were a few times where she didn't have it and we worked with her in doing functional tasks without it.
Q: Okay. Can you tell me the few times that she didn't have it? Was that in the beginning of the year, middle of the year, what do you remember?
A: It was in the beginning of the year.
Q: Okay. So since the beginning of the year can you think of any times that she has not worn her arm?
A: After the arm [repair], no, she's pretty much I think she's had it.
. . .

Q: . . . at times she may choose not to operate the hand device . . . . Can you tell me - - give me an example of what you were referring to there?
A: . . . Sometimes if she's cutting something out that requires a lot of turning the paper, you know, to cut a shape or something then the paper bunches up. If she was to do the Stickle Bricks and she's playing alongside her peers she may choose not to use it, she just uses the table.

[Tr. 6/11/08 pp. 140-141, Doc. #33, Attach. 36]. The Parents also included in support of their objection to the Defendants' motion a video recording of J.C. performing a variety of tactile tasks both with and without the myoelectric arm. The video shows that J.C. had nearly the same functionality without the myoelectric arm as she had with it. She appears to be a happy, well-adjusted and resourceful child. She was able to perform all the functions without it which she was able to perform with it, except zip her jacket, although she was able to

perform functions slightly more quickly with the myoelectric arm than without it.

The first myoelectric arm related cost that the Parents incurred after J.C. started at the Consolidated School accrued in early November 2007. As a result, Mr. C. spoke with Joanne Panicek, the Director of Pupil Personnel Services, on November 7, 2007 to request payment for costs associated with a new myoelectric arm. Ms. Panicek had never received a request of this kind and informed Mr. C that she needed to research the law regarding AT and seek legal advice. On November 9, 2007, Mr. C. wrote Ms. Panicek insisting that the District was responsible for payment because the myoelectric arm was AT and inquired whether a PPT was necessary to ensure payment. Mr. C.'s letter included his understanding of the law concerning AT devices and a perspective that "[o]nce a specific device or piece of software becomes a part of the IEP, the school is responsible for the purchase and installation of the device . . . and proper and consistent functioning of the device or software." [Exh. B-11, Doc. #33, Attach. 11]. Correspondence, dated November 27, 2007, from Ms. Panicek to Mr. C. reflects that the parties had "many conversations regarding this [payment] issue." At no time through November 2007 did the District focus on review of J.C.'s goals and objectives or modification of the IEP as an issue. On December 4, 2007, Mr. C. responded to Ms. Panicek, further asserting, and quoting AT guidelines to support his view, that the District bore responsibility for J.C.'s myoelectric arm. In addition, his letter further indicated a willingness to utilize his private insurance as a primary payor and seek the unpaid balance from the

Board despite his understanding that parents should not be required to use private insurance to cover costs of an AT device. In the letter, Mr. C. also noted concern over the Board's "process of determination":

> If I understand your November 27, 2007 letter correctly, that the "process of determination" as to responsibility for paying costs of the assistive technology hinges on what my insurance company will cover, please note that I strongly object to such a "process" . . .

[Exh. B-14, Doc. # 33, Attach. 12].

On December 11, 2007, Aimee Turner, the new Supervisor of Special Education submitted a "Notice of Planning And Placement Team Meeting" to be convened on December 19, 2007. The notice stated: "Please be advised that a Planning and Placement (PPT) meeting will be convened on behalf of [J.C.]" [Exh. B-17, Doc. #33, Attach. 13]. In identifying the meeting's purpose, Ms. Turner selected the category "other" and specified "Program Review" and did not select other available categories including "Plan Eval/Reeval," "Review Eval/Reeval," "Determine Eligibility," and "Review or Revise IEP." [*Id.*].

Shortly before the December PPT meeting, district staff received training on the wording of goals and objectives and instruction that goals should address skills within the curriculum and did not have to focus on the manner in which such skills would be accomplished.

On December 19, 2007, the Parents with their advocate and attorney, Daniel A. Thomas, attended the PPT meeting with Ms. Panicek, Ms. Turner, special education teacher Lisa Abrams, Barbara Cage, and physical therapist Diane

Twedt.  The Board advised the Parents at the beginning of the meeting that the agenda included a review of all of J.C.'s goals.  The meeting was largely directed by the Board's attorney Rebecca Santiago, and Ms. Panicek.

 The meeting summary for the December 19, 2007 PPT reflects the following:

> The team met to review [J.C.'s] program and revise the IEP as well as discuss a parent request regarding [J.C.'s] arm.  Progress on goals and objectives was reviewed.  Present level of performance was reviewed and revised based on current data.  Objectives were added to address the team's increased knowledge of [J. C.'s] strengths and weaknesses.  Parents requested that school district pay all costs for [J.C.'s] arm that are not covered by insurance.   The parents claim that the arm constitutes assistive technology.   District disagreed and denied the parents' request.   School staff believed primary disability should be changed to developmental delay, however parents disagreed.  Due to the extended school break, Mr. and Mrs. [C] agreed to extend the deadline for the mailing of the IEP until 5 school days after students and staff return to school (January 9, 2008).  [Exh. B-17, Doc. # 33, Attach. 13].

The December 2007 PPT listed concerns with J.C.'s gross motor skills and activities of daily living and based on J.C.'s revised levels of performance, amended some of J.C.'s goals and objectives.  The amendments included the removal of references to J.C.'s myoelectric arm.  As did the June 2007 IEP, the December PPT also included an indication that AT was "not required."  During the December PPT, the school-based team also decided to change J.C.'s primary disability category from "orthopedic impairment" to "developmental delay."   The Parents expressed disagreement with the change in J.C.'s primary disability category and amendment of her goals and objectives.

Mr. C's testimony regarding his understanding of the purpose of the

13

meeting reflects the following:

> A: No. It - - we - - no, we were - - weren't - - we weren't there to discuss anything that - - I take care of setting up, you know, the meetings. We didn't discuss anything about - - the only thought on our heads of going to this meeting were to discuss the costs allocation for the assistive technology device based on my request.
>
> Q: Okay. Did you ask at that meeting, you, your wife, or your attorney, that the meeting should be rescheduled because you weren't prepared to discuss goals and objectives or identification or other issues at that time?
>
> A: Ma'am, I wasn't allowed to ask anything or have a lot of input on anything. We were shut down on everything, just go forward, just kind of be quiet and let everybody do what they wanted to do. So it didn't seem like I had any rights to say anything there.
>
> Q: Okay. Well you had an attorney with you, did you not?
>
> A: I had an attorney - - I had - - I had an attorney there who was my advocate in the meeting.
>
> Q: Okay.
>
> A: He wasn't there as an attorney.
>
> Q: Okay. But he was there to advocate for you?
>
> A: Yes, he was.
>
> Q: Okay. Were you given your due process rights at these PPT meetings?
>
> A: I was given my due process, yes.

. . .

[Tr. 3/19/08 pg. 118-119, Doc. #33, Attach. #32].

In turn, Mrs. C. testified as follows:

> A: We came into the meeting. We sat down. And Joanne Panicek very professionally addressed everyone there and said that we're here today because we got to know [J.C.] better now and so we're going to just review all of the goals and the - - all of the goals written, and so we're just going to review her because we know her better now. And I said that's not why we're here. I said we're here because [Mr. C.] asked for her myoelectric arm to be covered by the school. I'm like that's really why we're here. And Joanne very nicely said, you know, what, let's - - we'll talk about that later, we're just going to go over all this first and we'll talk about that later, we have something that we think will make all of us very happy, but we'll talk about that later on. And then the meeting ensued.

**Q: And with regards to the control of the meeting, who was the point person of the PPT team that controlled the ebb and flow of the meeting?**

**A: Really, Santiago, the attorney, really controlled the whole ebb and flow of the meeting.**

**Q: And was there anyone else that was essentially the leader of the meeting?**

**A: Joanne Panicek**

**. . .**

**A: . . . I just sat there, actually aghast , at what was taking place. Yes they did talk about J.C., and they reviewed things about J.C., but I wasn't prepared to offer up what new goals. I hadn't thought about what new goals we should put into place for her because, yes, goals are changing - - ever changing, and new things should be added. Some things have been mastered and could be taken away, not all of them I don't believe. So it - - it- - was a very bizarre meeting to me and an upsetting one because we repeatedly objected to many things and we felt the motivation for that meeting was something other than what they professed to be there for. And so - - and we let that be very well known. We were just blown away when they decided to take - - why - - take out why she qualified for the program or orthopedic impairment and put in developmentally delayed, because - - I spend, other than when she's in school, just about every waking minute with this child. And I have two other children and I - - I don't see what they're seeing. I do agree that [J.C.] acts different in school than she acts at home. She's very - - she's more shy, she's not as outgoing in the classroom. . . . she was you know, talking like into me, like not talking outwardly like she normally would, she would hide her body a little bit. And I - - and I said to Lisa [Abrams], oh, my goodness, she's very different here, I'm like as far as what I see her to be. . . . And she said well it's her arm, because she hides her arm a lot behind her. And so she has - - she's - - she's shy.**

**. . .**

**Q: And with regards to the discussions at the December PPT in which Jennifer's shyness was discussed, did you dispute adding goals to the PPT to address the shyness?**

**A: Not at all. I - - I definitely would like that to be addressed if there's a self-esteem issue or if she's becoming aware that she's different than other children. . . . She wants to be like everybody else. She wants to wear her myo every day. If - - if she doesn't have it - - she's very upset if I have to send it out to be fixed, which I had to do once. She was very upset. . . .**

**Q: Did you dispute anything that transpired in that December PPT**

meeting?

A: Yes.

Q: What was that?

A: We disputed the reclassification of orthopedic impairment to developmental delay. We questioned the motivation behind it at this point in time; whey did that ever come up. . . . so I questioned the motivation behind that repeatedly and objected to the reclassification of that.

[Tr. 3/19/08 pg. 151, 153-156 Doc. #33, Attach. #32].

In turn. Ms. Panicek, provided the following testimony in response to

questioning by Attorney Thomas:

Q: And of all the members present at that December '07 PPT who was leading the PPT, if anyone?

A: You were.

Q: Excuse me? Excuse me?

A: That's what I said.

Q: I was? How was I leading the PPT?

A: Well, we began the PPT I believe Amiee [sic] Turner, who is our elementary coordinator began the PPT and we talked about the purpose of the PPT and we talked about wanting to review [J.C.'s] progress, which is our typical way of doing business. We always come in and discuss how kids are doing and the progress that they're making. And I recall you indicating that that was not why you were there. I believe I then said something to the effect that we'd like to go through her IEP and to review her goals and objectives and that we would have each person talk about the update in her progress. And at that point you agreed, I believe you agreed and that's what we did.

Q: How is it that I led the meeting based on that response?

A: You - - this is my personal opinion, were much more directive in telling us what you wanted to see, what you wanted to hear, what you wanted to do. It was a lively discussion.

Q: Did the attorney, Rebecca Santiago, play any role in leading the meeting as you understand it?

A: Yes she did.

Q: And di you play any role in leading the meeting as you understand it?

A: Yes I did.

Q: Okay.

A: Yes I did. I believe at one point Attorney Santiago did ask you if you

were in fact the attorney who represented the [Parents'] in the Birth to Three case and if you were in fact an attorney.
Q: And do you remember what I responded?
A: Yes.

[Tr. 4/14/08 pp. 18-19, Doc. #33, Attach. 33].  Ms. Panicek further testified:

Q: And the notice for the PPT we've heard said program review and it's my understanding from the questioning of you this morning that either the parents or their attorney objected when you went - - when whomever the staff member was wanted to discuss current levels of functioning, is that correct?
A: Yes.
Q: Okay.  And did they also object when you said we want to look at the goals and objectives and reword some of them?
A: They may have initially, but we then did it and they engaged in dialogue with us as we reviewed them.
Q: So was your understanding - - did they at anytime indicate that they were unprepared to discuss developmental delay at that meeting and they needed more time to be prepared?
A: I don't think they said that they weren't prepared, I think they said that they were surprised that they would be changing that label.
Q: Okay and with regard to the goals and objectives did they say they were unprepared to discuss goals and objectives?
A: They didn't say they were unprepared.  They didn't like the fact that we wanted to go through the goals and objectives and to review the present levels of performance and they said that they, you know, were there for another reason.  We talked about, you know, it being a protocol when we are working with children we typically review goals and objectives and get a statement from service providers on how children are doing.  It's not unusual for us to go through how are they doing? What are you seeing in the classroom? What are you seeing in related services? It's a dynamic document.

[*Id.* at 140-141].

Following the December PPT, J.C. continued to attend the Consolidated School and her teachers continued to assist her with use of her myoelectric arm and to achieve her identified goals and objectives.  By February 2008, J.C. could open and close a water bottle on her own and by March 2008, J.C. could play with

17

blocks and consistently used both arms during "motor group" to reach above her head and to make other movements.  J.C. also used her myoelectric arm successfully in connection with a variety of classroom activities.  At this time, J.C. also exhibited symmetrical posture, had normal muscle tone and could catch large items such as a beach ball, but had difficulty manipulating smaller objects.  Also by March 2008, J.C. mastered some skills that were considered beyond expectations for her age, including the adaptive strategy of stabilizing a marker or glue stick under her armpit while using her right hand to replace it's top.

Also after the PPT meeting, the Parents received a copy of the "proposed" December IEP.  The December IEP is considered "proposed," because the Parents objected to its implementation.  In the proposed IEP, the Board identified three reasons for refusing the Parents request that the school purchase and fund repair costs for the myoelectric: "The myoelectric 'device is a medical device'"; "The myoelectric is 'not assistive technology' device; and "The myoelectric is 'not necessary' for J.C. to receive FAPE'."  In response, the Parents raised several objections, on both substantive and procedural grounds, prompting commencement of the IDEA administrative hearing process.

On January 24, 2008 the Parents requested a due process hearing.  The Hearing Officer identified four issues for consideration at the hearing, and the Parents requested consideration of whether J.C.'s myoelectric arm qualified as AT as defined by the IDEA.  The Hearing Officer subsequently identified the following five issues for consideration:

1. Was the action of the PPT in revising the June 7, 2008 IEP on December 19, 2007 appropriate?
2. What is J.C.'s primary disability?
3. Is the myoelectric prosthetic arm, as currently used by J.C., an AT device as that term is defined by the Individuals with Disabilities Education Act ("IDEA")?
4. If the answer to issue #3 is yes, is the December 19, 2007 IEP inappropriate because it does not provide AT to meet J.C.'s needs regarding a myoelectric prosthetic arm?
5. If the answer to issue #3 is yes, should the Board be required to reimburse the Parents for the costs associated with J.C.'s myoelectric prosthetic arm?

The Hearing Officer presided over seven hearing dates spanning between March 19, 2008 and June 24, 2008. During the hearing, the Parents maintained that they were always under the impression and continue to believe that J.C. was accepted, starting with the initial PPT meeting, into the Board's special education program with related services based on her congenital handicap, and that her myoelectric arm was accepted and adopted into the IEPs as her AT device. The Parents also testified to their impression and continued belief that the December PPT and resulting IEP, the subject of the administrative hearing, was a bad faith exercise to remove the myoelectric arm from the June IEP so as to eliminate the "AT device" status of the myoelectric arm and in turn alleviate the Board of its financial obligations to cover its costs. During the hearing, the Board maintained its position that the myoelectric arm was a medical device and therefore excluded from consideration as an AT device, and that it did not consider cost as its motivation to convene the December PPT and change the IEP, and that the Board was simply accommodating the Parent's desire that J.C. use a myoelectric arm,

even though it was not necessary for her to receive a FAPE.

During the hearing, the Board objected to Parent Exhibits P-2 and P-8, which were marked for identification. The other Parent exhibits were entered as full exhibits. The Parents in turn objected to Exhibits B-32, B-33, and B-37 which were marked for identification, while the other Board exhibits were entered as full exhibits. During Mr. C's testimony, Exhibit P-2 was admitted into evidence over the Board's objection, and at the end of the hearing, the Board withdrew its objection to Exhibit P-8 and the Parents withdrew their objections to Exhibits B-32, B-33, and B-37. On June 24, 2008, the Plaintiffs presented rebuttal testimony and requested that the Board call Marie Moore, a special education teacher for the school, as a witness for cross-examination but was denied based on a finding that the evidence would be cumulative for one side or the other, and both parties agreed that the Hearing Officer should not draw any adverse inferences against either party for not calling Ms. Moore. [Final Decision and Order, pg. 49, Doc. #1].

As noted, the hearing record included a video that the Parents filmed during early March 2008. [Final Decision and Order, pg. 16, Doc. #1; Exh. P-8, Doc. #33, Attach. 28]. Throughout the video, Mrs. C. guides J.C. to engage in activities that included stringing large beads, stamping construction paper, cutting construction paper, playing percussive instruments, and playing with a large parachute-like fabric. *Id.* J.C. first engages in the activities using her myoelectric arm, and then engages in the tasks without her myoelectric arm. [*Id.*]. The video reflects that J.C. uses adaptive techniques to perform the tasks

either with or without the myoelectric arm and that while the tasks appear to be easier with the use of arm, the distinction in performance is not extreme as J.C. reflects an ability to perform the tasks adequately and successfully with or without her myoelectric arm.  [*Id.*]  The Parents submitted a lengthy brief "Closing Brief" dated July 25, 2008 that detailed what they perceived to be errors, violations, and acts of misconduct by the Board.  On September 4, 2008, the Hearing Officer issued her decision, finding in favor of the Board on all issues, concluding that:

1. The action of the PPT in revising the Student's June 7, 2007 IEP on December 19, 2007 was appropriate.
2. The Student's primary disability is orthopedic impairment; however, the PPT has the discretion to use the category of developmental delay while the Student is age three to five.
3. At the time of the December 19, 2007 PPT meeting, the Student's myoelectric prosthetic arm was not an AT device as the term is defined by Part B of the IDEA because it was not required for the Student to receive a FAPE.
4. The Board is not required to reimburse the Parents for the costs associated with the Student's myoelectric prosthetic arm.

The Parents filed the instant action on October 16, 2008 [Doc. #1].

<u>Standard</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable

inferences in its favor." *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal citations omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *Huminski*, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (internal citations omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

Yet, a party opposing summary judgment "must offer some hard evidence" in support of its factual assertions, *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), such that "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Evidence that is "merely colorable" or "not significantly probative" is insufficient to prevent a court from granting summary judgment.

22

*Anderson*, 477 U.S. at 249-50.  Thus mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

In addressing cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it.  When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other."  *Heublein, Inc. v. United States*, 996 F.2d 305, 313 (2d Cir. 1981)).  Instead, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Schwabenbauer*, 667 F.2d at 314.

### Analysis

***Court's Role in Assessing IDEA Administrative Decision***

The IDEA "'represents an ambitious federal effort' to ensure that all children are given access to a public education regardless of any disabilities they may suffer."  *A.S. v. Trumbull Bd. of Educ.,* 414 F. Supp. 2d 152, 169 (D.Conn. 2006) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)).  "Federal funding under the IDEA is available to states that develop educational plans that are 'reasonably calculated' to ensure that all children with disabilities receive a FAPE. *Id.* at 169 (internal citation and quotation marks omitted).  "A party dissatisfied

with a proposed education plan may challenge it in an administrative hearing, in which the [challenging] party bears the burden of proving the plan to be inadequate." *Id.*

As explained by the Supreme Court, the IDEA allows:

"[a]ny party aggrieved by the findings and decision" of the state administrative hearings "to bring a civil action" in "any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." The complaint, and therefore the civil action, may concern "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." In reviewing the complaint, the Act provides that a court "shall receive the record of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."

*Rowley*, 458 U.S. 176 at 204-205 (*quoting* 20 U.S.C. § 1415).

In reviewing a Final Decision:

[a] district court conducts an independent, but deferential review of a hearing officer's decision in an IDEA case. The IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy. The Supreme Court has cautioned that courts should not substitute their own notions of sound educational policy for those of the school authorities which they review.

*A.E. v. Westport Bd. of Educ.*, 463 F. Supp. 2d 208, 215 (D.Conn. 2006) (internal citations and quotation marks omitted). As a result, while courts are not to "simply rubber stamp administrative decisions, they are expected to give due weight to [administrative] proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and

difficult questions of educational policy." *Cerra v. Pawling Central School District*, 427 F.3d 186, 192 (2d Cir. 2005). (internal citations and quotation marks omitted). "Deference is particularly appropriate when . . . the state hearing officer's review has been thorough and careful." *P. ex rel Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118 (2d Cir. 2008) (internal citations and quotation marks omitted). However, "a hearing officer's interpretations of statutes or the federal constitution are afforded no deference." *Trumbull Bd.*, 414 F.Supp.2d at 173 (quoting *Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005)). Lastly,

> Courts that decide summary judgment motions on IDEA appeals are not dealing with summary judgment in its traditional setting. Summary judgment in IDEA actions is the most pragmatic procedural mechanism for resolving IDEA actions. When deciding a summary judgment motion in the IDEA context, a court's inquiry is not directed to discerning whether there are disputed issues of fact, but rather whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed. Therefore, it matter not, in the context, who initiates the motion.

*Westport Bd. of Educ.*, 463 F.Supp. at 214-215 (internal citations and quotation marks omitted).

Therefore in reviewing the Plaintiff's claims that arise under the IDEA, the Court is not focusing on the presence or absence of issues of material fact, but instead contemplates whether the record establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed. Further, while the parties have filed cross-motions for summary judgment and the Defendant also filed a Motion for

Judgment on the Administrative record as to the claim, the Court will treat the arguments in sum as a summary judgment motion as to an IDEA appeal as the Second Circuit recently observed, in connection with an IDEA proceeding, that the "Federal Rules of Civil Procedure do not provide for such a mechanism" and that a summary judgment standard was appropriate for the Circuit Court's review. *A.P. v. Woodstock Bd. of Educ.*, 370 Fed. Appx. 202, n. 3 (2d Cir. 2010).

*Assessment of the Plaintiffs' IDEA Claim*

The Supreme Court has identified a two part test for courts' review of claims regarding an alleged failure to comply with the IDEA's requirements:

First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley*, 458 U.S. 176, 206-207 (1982).

A. Board's Compliance with IDEA'S Procedural Requirements

"Procedural flaws alone do not automatically require a court to find that a board denied a student a FAPE. Procedural flaws that result in the loss of an educational opportunity, or that seriously infringe the parents' opportunity to participate in the IEP formulation process, however, 'clearly result in the denial of a FAPE.'" *A.E. v. Westport Bd. of Educ.*, 463 F.Supp.2d 208, 216 (D.Conn 2006)

**(quoting *W.A. v. Pascarella*, 153 F. Supp. 2d 144, 153 (D.Conn. 2001)).**

In this case, the Plaintiff contends that the Board provided the Parents inadequate notice regarding the December 19, 2007 meeting in violation of the IDEA and its implementing regulations by intentionally stating a vague purpose for the meeting and allowing the Parents to believe that the only purpose for the meeting was to formalize the school's reimbursement of expenses for J.C.'s new myoelectric.

As required by federal law, Connecticut has adopted a statutory scheme and administrative regulations to implement the IDEA's provisions. *See* Conn. Gen. Stat. § 10-76a et seq.; Conn. Agencies Regs. § 10-76d-1 et seq. Educational programs for students with disabilities are designed and implemented through an IEP which identifies a student's levels of educational performance, measurable goals, and the educational program and services and accommodations that are to be provided. 20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320(a).

The IDEA and its implementing federal and state regulations set forth procedures intended to provide a framework for developing an appropriate IEP in light of a student's needs and abilities and to ensure parental participation in the ongoing development of a child's educational program. Pursuant to these procedures, if a student requires special education, a school district must convene a PPT to develop an IEP via an individualized inquiry into the child's needs. The PPT consists of the student's parents/guardians and appropriate regular and special education personnel, including teachers and evaluators, and

parents may invite other individuals with relevant expertise to participate. The IEP must be reviewed at least once per year, and it should be periodically revised in response to information provided by the parents and staff and to ongoing evaluations of the child's progress. *See* 20 U.S.C. § 1414(d); 34 C.F.R. §§ 300.320 – 300.324; Conn. Agencies Regs. §§ 10-76d-10 – 10-76d-12.

As related to notice, federal and Connecticut State implementing regulations identify that, to ensure adequate notice and parental participation, a district must:

> . . . take steps to ensure that one or both of the parents of a child with a disability are present at each IEP team meeting or are afforded the opportunity to participate, including - -
>
> (1) Notifying parents of the meeting early enough to ensure that they will have an opportunity to attend; and
> (2) Scheduling the meeting at a mutually agreed on time and place.

34 C.F.R. § 300.322(a). Further, a district must provide notice that identifies the meeting's purpose, time, location, and participants. 34 C.F.R. § 300.322(b); *See also* Conn. Reg. § 10-76d-12(c). Moreover, Connecticut's implementing regulations identify that:

> Steps to ensure parental participation shall be taken in accordance with the following.
>
> (1) At least five days prior to the meeting, parents shall be advised in writing, in their dominant language, of the rights to be participating members of the planning and placement team.
> (2) Such notice shall also specify the purpose, time and location of the meeting and who has been invited.
> . . .
> (5) Each board of education shall take any and all actions necessary to ensure that the parents understand the proceedings at the meeting. . . .

Conn. Reg. § 10-76d-12(c).

As the notice for the December 19, 2007 meeting specified its date, time, place, and invitees; identified the Parents' right to bring other individuals to the meeting; and instructed the Parents to call the school with any questions or if rescheduling was necessary, the only issue is whether the notice appropriately specified the purpose of the meeting. The notice form prompted the Board to identify the purpose of the meeting and check all options that applied. The Board selected the option of "other: (specify)" and identified "Program Review" as the meeting's purpose. As noted the other available selections included: "Review Referral," "Plan Eval/Reeval," "Review Eval/Reeval," "Determine Eligibility," "Develop IEP," "Review or Revise IEP," "Conduct Annual Review," "Transition Planning," and "Manifestation Determination."

The Parents contend that they did not contemplate the possibility of a full program review at the December meeting because they contend that such meetings typically happen once per year, and J.C's next scheduled IEP review was set for June 8, 2008. They further note that Ms. Panicek sent out notice of the meeting following Mr. C.'s inquiry about whether a meeting was necessary to discuss the district's obligation to pay for J.C.'s myoelectric arm and that they were not properly informed of the meeting's scope until their arrival at the meeting. Notably the IDEA requires a local educational agency to ensure that an IEP Team

(i)     reviews the child's IEP periodically, but not less frequently

29

               than annually, to determine whether the annual goals for the child are being achieved; and

   (ii)     revises the IEP as appropriate to address - -

        (I)     any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate;

        (II)    the results of any reevaluation conducted under this section;

        (III)   information about the child provided to, or by, the parents. . .

        (IV)   the child's anticipated needs; or

        (V)    Other matters.

20 U.S.C. § 1414(d)(4)(A). Therefore a full program review is not limited to once a year. In addition, the term "program review" is a term of significance in the IDEA context indicating a broad potential scope for the meeting. While the notice form, as completed and its available options for selection, are not the pinnacle of clarity, it sufficed to place the Parents on notice that the meeting would include a broad review of J.C.'s special education services, particularly as it was organized as a full PPT meeting as opposed to an informal meeting to discuss funding or pursuant to notice that specified "payment for the myoelectric arm" as the limited scope of the meeting. Further, the fact that Mr. C. requested a PPT solely for the purpose of discussing payment for J.C.'s myoelectric arm does not in turn restrict what topics may be addressed at a PPT meeting. Indeed the Plaintiffs have asserted no authority that every topic of discussion for a PPT meeting is to be detailed in identifying the purpose of that meeting. As noted by the Hearing Officer, the December 19, 2007 meeting was the first PPT meeting held after J.C.'s September 4, 2007 enrollment in the Consolidated School's preschool program. Therefore a fuller discussion of J.C.'s progress and skills, based on actual

classroom interaction, was wholly appropriate and foreseeable.

The factual record also reflects that the Parents were disappointed, and surprised to learn that the meeting would constitute a full programmatic review due to their assumption that the meeting would only address payment arrangements for the myoelectric arm.  Yet while the Parents' testimony reflect that they were caught off-guard by the meeting's actual scope, and that Mr. C. in particular was somewhat withdrawn during the meeting, that sentiment does not disrupt the fact that the Parents and their advocate actively participated in the meeting by providing comments and noting objections to various actions during the course of meeting.  Further, the Parents and their advocate while frustrated with decisions and adjustments made during the meeting did not indicate a request to in any way to postpone or reschedule the meeting due to a need for further preparation.  Accordingly, while identifying that the notice for the meeting was not ideal and not fully and comprehensively descriptive of any and all items to be discussed during the meeting it did not amount to a violation of the notice provisions of the IDEA and to the extent it reflects a procedural flaw under the IDEA, there is no indication that such a flaw resulted in either a loss of an educational opportunity, or serious infringement upon the Parents' opportunity to participate in the IEP formulation process as the Parents provided their input, mainly their objections, during the course of the meeting.

Further, the Parents allege that the Board denied their right to parental participation separate and apart from the allegedly defective notice of meeting

due to unilateral amendment of J.C.'s IEP without consideration of the Parents' objection, and the Parents' belief that the entire outcome of the meeting was predetermined.

To ensure parental participation, the IDEA requires, *inter alia*:

[a]n opportunity for the parents of a child with a disability to examine all records relating to such a child and to participate in meetings with respect to the identification, evaluation and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent evaluation of the child.

*Cerra v. Pawling Cent. School District*, 427 F.3d 186, 192 (2d Cir. 2005) (quoting 20 U.S.C. § 1415(b)(1)). In turn, the IDEA's accompanying regulations further note that in connection with parental participation: "[e]ach public agency must ensure that a parent of each child with a disability is a member of any group that makes decisions on the educational placement of a child." 34 C.F.R. § 300.501(c)(1). Notably, the regulations make no requirements on how to implement the parental involvement requirement, other than by fulfilling the notice requirements listed in 34 C.F.R. § 300.322(a)-(b)(1). 34 C.F.R. § 300.501(c)(2).

While parents possess an unquestionable right to notice and an opportunity to attend and participate, this right is not limitless. "A meeting . . . does not include preparatory activities that public agency personnel engage in to develop a proposal or response to a parent proposal that will be discussed at a later meeting." 34 C.F.R. 300.501(b)(3). As previously observed by a hearing officer in a decision reviewed by this Court "a difference exists between [a district] being 'open-minded' and 'blank-minded' . . . [w]hile a school system must

not finalize its placement decision before an IEP meeting, it can, and should, have given some thought to that placement." *Westport Bd. of Educ.*, 463 F. Supp.2d at 217. (internal citation and quotation marks omitted).

Additionally, a PPT is not required to adopt the parents' recommendations voiced at the meeting. The spirit of the parental participation requirement has remained the same since the precursor to the IDEA was enacted in 1975, the Education for All Handicapped Children Act ("EHA"): parental "participation means something more than mere presence; it means being afforded the opportunity to be an equal collaborator, whose views are entitled to as much consideration and weight as those of other members of the team in the formulation and evaluation of their child's education." *W.A. and M.A. v. Pascarella*, 153 F. Supp. 2d 144, 154 (D.Conn. 2001) (quoting *V.W. v. Favolise*, 131 F.R.D. 654, 659 (D.Conn. 1990). "[T]he parental participation requirements do not equate to a mandate for the provision of recommended services, if the services that are otherwise being provided constitute an [sic] FAPE." *Id.* Thus, the Parents may attend and participate collaboratively, but they do not have the power to veto or dictate the terms of an IEP.

The Court finds that the Hearing Officer's decision was sound and that the Board did not deprive the Parents of a meaningful opportunity to participate with the aid of an advocate in J.C.'s educational placement as the Parents attended and participated in J.C.'s PPT meetings, received representation from a qualified parental advocate with legal expertise, regularly corresponded with members of

33

the PPT, suggested changes during PPT meetings, and strongly lobbied for the incorporation and recognition of J.C.'s myoelectric arm as an AT necessary to achieve FAPE.  The mere fact that the Parents were unsuccessful in securing all of their wishes for J.C.'s placement does not equate a lack of meaningful opportunity for parental involvement.  To the contrary, the Parents active involvement and inquiry regarding the myoelectric arm's status prompted, in part, the PPT to properly research the issue and ensure that the IEP was appropriately designed to avoid misinterpretation of the myoelectric arm's role in J.C.'s special education goals.

Further, the Court agrees with the Hearing Officer's finding that the Board did not engage in illegal "predetermination;" on the contrary, the record reflects prudent and permissible preparatory activities, including research of the issue of the myoelectric arm's necessity in response to Mr. C's inquiry and the preparation of PPT members to share and discuss their observations of J.C. in the educational environment.  Accordingly, the Court upholds the Hearing Officer's findings regarding the Parents' parental participation.


B.  IDEA'S Substantive Requirements

Violation of the IDEA's substantive requirements requires a showing that the revised "individualized education program developed through the Act's procedures" was not "reasonably calculated to enable the child to receive educational benefits."  *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-207 (1982*).*

In reviewing this claim, the Court must keep in mind that a district is not required to furnish "every special service necessary to maximize each handicapped child's potential." *Cerra v. Pawling Cent. School District*, 427 F.3d 186, 196 (2d Cir. 2005) (quoting *Rowley*, 458 U.S. at 207.). "Instead, the IDEA is satisfied if the school district 'provides an IEP that is likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" *A.S. v. Trumbull Bd. of Educ.,* 414 F. Supp. 2d 152, 173 (D.Conn. 2006) (quoting *Cerra*, 427 F.3d at 195).

Specifically, the Plaintiffs assert that the December PPT meeting resulted in a revised IEP for their daughter which fell short of the federal statute's requirement. Specifically, the parents claim that because the revised IEP refused to acknowledge J.C.'s myoelectric arm as an AT device, and because the PPT changed J.C.'s primary disability category, from orthopedic impairment to developmental delay, she was unable to receive educational benefits under that plan and was thus denied a FAPE.

### i.    Myoelectric Arm as Assistive Technology

The Parents contend that the definition of "assistive technology" has been misapplied to their daughter's prosthesis by the hearing officer, who wrongly excluded the myoelectric arm as a "medical device" based upon the testimony of an unqualified witness. The IDEA defines an "assistive technology device" as "any item, piece of equipment, or product system, whether acquired

commercially, off the shelf, modified, or customized, that is used to increase, maintain, or improve functional capabilities of a child with a disability." 20 U.S.C. § 1401(1)(A). Under 34 C.F.R. § 300.105(a), each public agency is required to ensure AT for a child with disability if required as part of the child's special education, related services or supplementary aids and services. While federal regulations do not supply an "exhaustive list" of AT devices, a device's eligibility for AT designation "depends on . . . whether the child's [IEP team] determines that the child needs the device in order to receive [FAPE]," as well as whether it meets the statutory definition of AT pursuant to 20 U.S.C. § 1401(1)(A)-(B). 71 Fed. Reg. 46540, 46547 (Aug. 14, 2006). Further, "[o]n a case-by-case basis, the use of school-purchased assistive technology devices in a child's home or other setting is required if the child's IEP team determines that the child needs access to those devices in order to receive FAPE." 34 C.F.R. § 300.105(b). "Therefore, although assistive technology will almost always be beneficial, a school is only required to provide it if the technology is necessary. Moreover, the failure to provide assistive technology denies a student FAPE only if the student could not obtain a meaningful benefit without such technology." *High v. Exeter Tp. School Dist.*, 2010 WL 363832 at *5 (E.D. Pa. Feb. 1, 2010).

Some devices and services fall outside the scope of the statutory definition of "assistive technology." AT "does not include a medical device that is surgically implanted, or the replacement of such a device." 20 U.S.C. § 1401(1)(B).

In this case, the hearing officer received expert testimony of a Dr. Cruz-Zeno who testified that a myoelectric arm is a medical device, observing: "it is necessary for a doctor with experience in dealing with prosthetics to write a prescription for a prosthetic limb and oversee the treatment of the patient . . . for reasons including the fact that there could be problems with the fitting or the residual limb or stump." [Doc. #1, pg. 51]. Furthermore, "there can be medical problems like pain, skin problems, edema, volume changes, allergic reactions, dermatitis, skin ulcers, skeletal misalignments, [etc.] . . ." *Id.* The Board contends that, even though not surgically implanted, the myoelectric arm constitutes a medical device because the expert's testimony reflects that it requires a physician's supervision. *See Cedar Rapids Cmty. Sch. Dist. V. Garret F.,* 526 U.S. 66, 73-74 (1999); *Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883, 892-894 (1984) (defining the "medical services" clause of the IDEA as "services that must be performed by a physician"). The Parents in turn object on the grounds that Dr. Cruz-Zeno never worked with J.C. directly and highlighting that although the Parents consulted a physician prior to selecting the myoelectric arm, the arm did not require a prescription, and was fitted by non-physicians. The Parents do not squarely address the extent to which J.C. has a need for medical supervision that is consequent to her wearing the myoelectric arm and fail to counter the Hearing Officer's findings that the Parents consulted a physician that specialized in orthopedics to identify an appropriate prosthetic and identify any potential problems the prosthetic would have presented. Additionally, while a prescription

is not required for J.C.'s prosthetic, the fact that the Parents obtained a prescription from J.C.'s pediatrician suggests that they made a representation that the myoelectric arm was being obtained for a medical purpose.

Therefore this Court is unpersuaded that J.C.'s myoelectric does not constitute a medical device thereby excluding it from the definition of AT. Regardless of whether the myoelectric arm is a medical device, the Court finds the record does not support a conclusion that the Hearing Officer was wrong in concluding a failure to provide the myoelectric arm as assistive technology does not deny J.C. access to FAPE.

The IDEA does not require schools to provide the very best educational opportunities and services possible, as the purpose of the IDEA is "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Bd. Of Educ. v. Rowley*, 458 U.S. 176, 197 n. 21 (1982). J.C. can obtain a meaningful benefit and appropriate educational services without such technology. The video of J.C. and testimony regarding J.C.'s ability to perform tasks with or without the myoelectric arm, demonstrates that the myoelectric arm is not necessary to provide FAPE. J.C. is able to complete virtually all tasks both with and without the myoeletric arm. The IDEA does not require the provision of ideal circumstances necessary for a student to reach his or her optimal potential. *See Walczak v. Florida Union Free School, 1*42 F. 3d. 119 (2d Cir. 1998); *See also Sherman v. Mamaroneck Union Free School Dist.* 340 F.3d 87 (where the Second Circuit concluded that

denial of the use of an advanced calculator did not deprive student of FAPE within the meaning of the IDEA).    The record supports the administrative finding that J.C. is highly adaptive and well-equipped to meet the tasks of her pre-school curriculum without the use of a myoelectric arm.

Also, the Hearing Officer was correct to rule that while the June 2007 IEP mentioned the myoelectric arm, and the arm was discussed during the April 2007 meeting, these instances did not formally designate the arm as AT.  The Parents incorrectly assert that the PPT agreed upon an AT designation for the myoelectric arm prior to December 2007.  The record reflects that the myoelectric arm was discussed during the April meeting in the context of J.C.'s transition from Birth-to-Three services where it was accepted as necessary AT, prior to any evaluation or assessment of J.C.'s abilities.  However the June 2007 IEP clearly stated that it was "Not Required."

ii.    Primary Disability Category

The Parents also challenge the Board's change of J.C.'s primary disability category from "orthopedic impairment" to "developmental delay." They claim the school-based members of the PPT altered the IEP in a manner which deprived their daughter of a FAPE.  The federal regulations pursuant to the IDEA define a "developmentally delayed" child, aged three to nine, in the following manner:

> [a] child – (1) [w]ho is experiencing developmental delays, as defined by the State and as measured by appropriate diagnostic instruments and procedures, in one or more of the following areas: [p]hysical

development, cognitive development, communication development, social or emotional development, or adaptive development; and (2) [w]ho, by reason thereof, needs special education or related services.

34 C.F.R. § 300.8 (b)(1)-(2).  Additionally, federal regulations recognize "orthopedic impairment" as a disability if it manifests itself as a "severe orthopedic impairment that adversely affects a child's educational performance. The term includes impairments caused by a congenital anomaly, impairments caused by disease (e.g. poliomyelitis, bone tuberculosis), and impairments from other causes (e.g. cerebral palsy, amputations, and fractures or burns that cause contractures)."  34 C.F.R. § 300.8(c)(8).

The State of Connecticut defines a "child requiring special education" as a child:

"(i) who meets the criteria for eligibility for special education pursuant to the individuals with disabilities education act, 20 U.S.C.1400, *et seq.*, as amended from time to time; . . . or (B) is age three, four, or five and is experiencing developmental delay, as defined in section 10-76a of the Connecticut General Statutes, that causes such child to require special education."

Regs. Conn. State Agencies § 10-76a-1(4).  The State defines "developmental delay" in terms nearly identical to the IDEA: "significant delay in one or more of the following areas: (A) [p]hysical development; (B) communication development; (C) cognitive development; (D) social or emotional development; or (E) adaptive development, as measured by appropriate diagnostic instruments and procedures demonstrated by scores obtained on an appropriate norm-referenced standardized diagnostic instrument."  Conn.Gen.Stat. § 10-76a(6).

The Hearing Officer appropriately recognized that "J.C." could fit into either

40

disability category.  A reading of the federal definition of "orthopedic impairment" reveals that "J.C." does fit this category due to her congenital amputation, and the Hearing Officer acknowledged that fact noting that the "Student's primary disability is orthopedic impairment, however, the PPT has the discretion to use the category of developmental delay while the Student is age three to five."  [Final Hearing and Order, pg. 72, Doc. # 1].  The Court agrees with the Hearing Officer's conclusion that the change in J.C.'s category did not violate the IDEA, particularly as J.C.'s services remained the same under both categories and appears supported by the PPT members observation of J.C. and even Mrs. C's testimony during the hearing as it reflected that in addition to orthopedic challenges, J.C. experienced social and emotional challenges due to awareness of her congenital amputation.

In sum, the Plaintiffs' first claim for violation of the IDEA by virtue of procedural and substantive violations fails as the Plaintiffs have not shown that J.C. has been, or will be denied access to FAPE within the meaning of the statute. The Board's motion for Summary Judgment as to this is Count is granted while the Plaintiffs' cross-motion as to this claim is denied, and the Hearing Officer's decision is therefore upheld

*Assessment of the Plaintiffs' § 504 Rehabilitation Act Claim*

In asserting its claim in Count Two, the Plaintiff does not present any additional facts aside from those that are part of the administrative record. § 504 requires:

> No otherwise qualified individual with a disability in the United States …shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a). To establish a violation of § 504, the Plaintiffs must demonstrate: (1) that J.C. has a disability for the purposes of the Rehabilitation Act, (2) that she is "otherwise qualified" for the benefit she has been denied, (3) that she has been denied the benefits solely by reason of her disability, and (4) that the benefit is part of a program or activity receiving Federal financial assistance. *See A.W. v. Marlborough Co.*, 25 F. Supp. 2d 27, 31 (D. Conn. 1998). Public school districts constitute an entity that falls within § 504's purview as "[a] recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The Court's inquiry focuses on whether J.C. was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *A.S. v. Trumbull Bd. of Educ.,* 414 F. Supp. 2d 152, 182 (D.Conn. 2006) (internal citations omitted). Acts

of discrimination against a disabled student must be intentional to support a claim arising under the Rehabilitation Act, and courts in the Second Circuit regularly require conduct that is akin to "bad faith or gross misjudgment." *Brennan v. Regional School Dist*, 531 F. Supp. 2d 245 n. 37 (D. Conn. 2008). Therefore, while the IDEA and the Rehabilitation Act serve similar purposes, they differ in scope:

> While both the [IDEA] and section 504 mandate that local educational institutions provide a FAPE to children with disabilities, the scope of protection afforded under each of these statutes is somewhat different. Section 504 provides relief from discrimination, whereas the IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination.

*A.W. v. Marlborough Co.*, 25 F. Supp. 2d 27, 31 (D.Conn. 1998).

§ 504 of the Rehabilitation Act defines an "individual with a disability" more broadly "in certain respects than the definition of a 'child with [a] disability' under the IDEA . . . " *Muller v. Committee on Special Education of the East Islip Union Free School District*, 145 F.3d 95, n. 2 (2d Cir. 1998). "For example, § 504's reach extends not only to individuals who in fact have a disability, but also to individuals who are regarded as having such a disability (whether or not that perception is correct)." *Id.* Federal regulations that implement § 504 consider the denial of FAPE to a disabled student to constitute disability covered by the act. *Brennan* 531 F. Supp. 2d at 278 (D.Conn. 2008). An "appropriate education" within the meaning of § 504 means: "regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are

met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36." *J.D. v. Pawlet School District*, 224 F.3d 60, 70 (2d Cir. 2000) (quoting 34 C.F.R. § 104.33(b)(1)).

Lastly, much like the IDEA, a public school district is not required to provide a disabled student with a potential-maximizing education under § 504; rather, only reasonable accommodations that give those students the same access to the benefits of a public education as all other students. *See Id.* at 70.  In sum, the IDEA "focuses on the content of a student's educational program, but Section 504 combats discrimination and safeguards 'equal access to the school's programs.'" *Trumbull Bd. Of Ed.* 414 F. Supp. 2d at 182 (internal citation and quotation mark omitted).

The Court finds that a reasonable trier of fact would not find that the District violated J.C.'s rights pursuant to the Rehabilitation Act.  While the Plaintiff cites to evidence of the myoelectric arm's expense and the fact that J.C.'s program was reviewed and adjusted following Mr. C's request for payment, the myoelectric arm was designated as "Not Required" in the IEP prior to and after the review and adjustment.  The record lacks sufficient evidence for a reasonable trier of fact to conclude that the District acted in bad faith or gross misjudgment to intentionally discriminate against J.C. and deprive her of a FAPE.  As explained in connection with the Plaintiff's IDEA claim, the record fails to support a finding that J.C. was denied FAPE, and reflects that the District's identification and adjustment of J.C.'s special education services plan was

appropriate and driven by consideration of J.C.'s abilities. Similarly, the evidence demonstrates that J.C.'s special education plan provides reasonable accommodations to ensure that J.C. has the same access to the benefits of a public education as all other students. As a result Defendant's Motion for Summary Judgment as to this claim is granted, and the Plaintiff's Cross-Motion for Summary Judgment as to this claim is denied.

*Assessment of the Plaintiffs' Connecticut Special Education Statute Claim*

The Plaintiffs also allege that the Hearing Officer violated J.C.'s rights to receive appropriate special education services under Connecticut General Statute § 10-76, *et seq.* and its regulations by ruling in the District's favor.

Connecticut enacted its own special education statute in order to align itself with the IDEA and thereby maintain eligibility for federal funding. *Trumbull Bd. Of Ed.* 414 F. Supp. 2d at 184-85. In order to qualify for this funding, "several provisions of Connecticut's statute make direct reference to the IDEA, see, *e.g.*, Conn.Gen.Stat. § 10-76a(5) (defining 'A child requiring special education' with reference to 'the criteria for eligibility for special education pursuant to the Individuals [w]ith Disabilities Education Act); *id.* § 10-76d (providing that a PPT shall act 'in accordance with the provisions of the Individuals [w]ith Disabilities Education Act')". *Id. at 185.* As previously observed by this Court, "Connecticut law does not offer a substantive standard any more exacting than the IDEA's requirement of a 'free appropriate public education.'" *Id.* Accordingly, pursuant

45

to the same reasoning supporting the Court's finding that the District did not commit a violation pursuant to the IDEA, and as the Plaintiffs fail to identify a unique requirement of the state law that was not addressed in connection with the Plaintiffs' IDEA claim, the Defendant's motion for summary judgment is granted as to this claim, and the Plaintiffs' motion for summary judgment as to this claim is denied.

### *Assessment of the Plaintiffs' Uniform Administrative Practices Act Claim*

J.C.'s parents allege, in their fourth claim, that the Hearing Officer violated the IDEA's procedural requirements for a fair administrative hearing and seek relief pursuant to the Uniform Administrative Procedures Act (UAPA). Conn.Gen.Stat. § 4-183.  Under this statute, a person who has exhausted all administrative remedies available within an agency and is aggrieved by the agency's final decision may appeal to the Superior Court of Connecticut. Conn.Gen.Stat. § 4-183(a).  The provisions of this statute also govern time limits for filing appeals, service of process, the appeal process in court, and costs; it contains no provisions governing hearing officer impartiality or conduct. Conn.Gen.Stat. § 4-183.

The Parents allege that the hearing officer demonstrated "a palpable bias in favor of the school Board throughout the entire hearing, and such bias is amply reflected in the arbitrary and capricious manner in which she arrived at the erroneous conclusions of fact and law that constitute her final decision and

order." [Doc. #35-2, pg. 28]. The Plaintiffs invoke three specific allegations, namely that the Hearing Officer: (1) did not answer the five agreed upon issues in the proper order during the administrative hearing; (2) refused to call a witness requested by the Parents, and as a result of this missing testimony negative inferences were drawn against their case; and (3) entered reports and observations from the Board into evidence which were dated after the December 2007 PPT meeting.

As the UAPA governs appeals made to the Connecticut Superior Court, the Court finds that the UAPA is inapplicable to this proceeding for the reasons cited by this Court in *B.L. v. New Britain Bd. Of Educ.*:

> Connecticut General Statute § 10-76h sets forth the procedural and substantive obligations of parents and educational agencies in regard to the IDEA. More specifically, §10-76h sets forth the procedures for parties to request a due process hearing, the procedures for Department of Education to follow in appointing a hearing officer and the powers and duties of the hearing officer in such a hearing. In addition, subsection (d)(4) of §10-76h provides, in relevant part, that "[a]ppeals from the decision of [an IDEA] hearing officer or board shall be taken in the manner set forth in Connecticut General Statute §4-183, except the court shall hear additional evidence at the request of a party." Section 4-183, however, authorizes appeals from administrative decisions, such as a hearing officer's decision, to the Connecticut Superior Court, and sets forth limitations on the court's obligations and powers in such an appeal. Rather than pursue an appeal pursuant to §4-183 in the Superior Court, the plaintiff in this case chose to challenge the hearing officer's decision in this Court pursuant to 20 U.S.C. §1415(i)(2) (allowing an aggrieved party to bring a civil action in an appropriate district court). In other words, this Court is not subject to the standards governing appeals to the Connecticut Superior Court, but rather is subject to the procedures and standard of review set forth in §1415(i)(2).

394 F. Supp. 2d 522, 543 (D. Conn. 2005).

Accordingly, as the Plaintiffs have pursued an action in this Court pursuant to §1415, and the Court has reviewed and upheld the Hearing Officer's decision by a preponderance of the evidence, the Hearing Officer's decision is not subject to the UAPA in this Court. Further, the Court notes that the Hearing Officer's decision was well-reasoned and clearly established and incorporated the factual record before it and that the decision was not issued in an arbitrary and capricious manner as the record reflects that the evidentiary conflicts at the hearing level were resolved through the parties' acts of compromise and willingness to withdraw objections, and that the ruling to exclude the testimony of Marie Moore was not reflective of bias but was an appropriate decision to avoid cumulative testimony which resulted in no prejudice to the Parents. Accordingly, the Defendant's motion for summary judgment is granted while the Plaintiff's motion for summary judgment as to this claim is denied.

### *Assessment of the Plaintiffs' Common Law Fraud and Misrepresentation Claims*

The Plaintiffs' fifth and final claim alleges that the District committed fraud and misrepresentation. The Plaintiffs claim that the Board staged the December 2007 PPT meeting as a "program review" in order to remove all references to J.C.'s myoelectric arm from her IEP and change J.C.'s primary disability categories.

Connecticut General Statute § 52-557n(a)(2) provides however: "Except as otherwise provided by law, a political subdivision of the state shall not be liable

for damages to person or property caused by; (A) Acts or omissions of any employee, officer, or agent which constitute criminal conduct, fraud, actual malice or willful misconduct. . . " *O'Connor v. Bd. Of Educ.* 90 Conn. App. 59, 64-65 (2005).  In alleging acts of fraud and misrepresentation by members of the PPT, the Plaintiffs are alleging both fraud and willful misconduct within the meaning of the statute, and the Board as a political subdivision of Connecticut is shielded by the immunity provided in § 52-557n(a)(2) and therefore "immune from suit for the intentional torts of its employees, regardless of whether the acts were ministerial or discretionary."  *Id.* at 65.  Further, the Plaintiff has not identified any statute that would abrogate the Board's immunity, and Connecticut courts note that "the general rule developed in our case law is that a municipality is immune from liability for [its tortious acts] unless the legislature has enacted a statute abrogating that immunity."  *Id.* at n.5 (internal citation and quotation marks omitted).

As a result the Defendant's motion for summary judgment is granted as to this fifth and final count and denied as to the Plaintiffs' cross-motion for summary judgment.


<u>Conclusion</u>

Pursuant to the foregoing analysis, the Defendant's motion for summary judgment filed as both a motion for summary judgment and motion for judgment on the administrative record [Docs. ## 32-33] is GRANTED as to all counts, and

the Plaintiffs' cross-motion for summary judgment [Doc. 35] is DENIED as to all counts.  The Clerk is directed to close this case file.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  March 31, 2011.